TYLER TERM, 1887.

No. 2567.

GEORGE BAILEY *v.* THE STATE.

1. PRACTICE — CONTINUANCE — NEW TRIAL. — See the opinion in extenso for the substance of absent evidence set out in an application for a continuance *held* not to entitle the accused to a continuance, because, as stated in the application, it would in any event be inadmissible, and because, in the second place, in view of the proof on the trial, its falsity is apparent. For the same reasons the trial court did not err in refusing a new trial asked because of the overruled application.

2. SAME—CONFESSIONS.—The confession of an accused, made after arrest and while in custody, if voluntarily made after due caution that it may be used in evidence against him, is competent for the State, even though it was elicited by the questions of the prosecuting attorney. See the opinion on the question as applied to this case.

3. SAME—JURY LAW.—The mere separation of accepted jurors, pending the completion of the jury, even though it be shown that the separated jurors conversed with outside persons while so separated, will not necessarily require the reversal of a conviction.

4. MURDER—ACCOMPLICE TESTIMONY—FACT CASE.—The principle is well settled that a conviction for crime can not be had upon the uncorroborated testimony of an accomplice. See the statement of the case for evidence *held* sufficient not only to corroborate the testimony of the accomplice, but, independent of the accomplice testimony, sufficient to support a capital conviction for murder. .

5. SAME—CHARGE OF THE COURT.—Omissions in the charge of the court, unless excepted *to*, or unless the defendant seeks *to* supply them by special instructions, will be revised by this court only when they are calculated to prejudice the accused.

APPEAL from the District Court of Wharton. Tried below before the Hon. W. H. Burkhart.

The death penalty was assessed against the appellant in this case upon his conviction in the first degree for the murder of John Smith, in Wharton county, Texas, on the first day of December, 1886.

H. N. Spooner was the first witness for the State. He testified that he knew John Smith, the deceased, and last saw him alive on the afternoon of the first day of December, 1886. He saw Smith's dead body on the next morning in a thicket of weeds not far from the old sugar house on the Harrison place,

which was in Wharton county. The evident cause of Smith's death was a gun shot wound which penetrated his right groin. Smith's body was found between two and three hundred yards from the house on the Harrison place in which the defendant lived, and about four hundred yards from the residence of the witness, who had charge of the said place.

The witness instituted investigation of the death of said Smith on the morning after it occurred. He first discovered a pool of blood on the side of the main road which led to the "middle quarter." Thence he followed a small trail to a point beyond the old sugar house and near an old shop, where he found a second pool of blood. The ground at this point indicated that Smith had reposed for a while. Fifteen or twenty steps beyond the last mentioned point the witness found Smith's body, the feet lying near the small trail. The place where the body was found was between seventy-five and one hundred yards distant from the point on the main road where witness discovered the first pool of blood. At a point off the road, and between fifteen and twenty feet distant from the pool of blood first mentioned, the witness discovered the place whence, in all probability, the fatal shot was fired. It was indicated by the foot tracks of one or more persons, and by broken and mashed weeds. Soon after the witness reached the body of the deceased, Bob Jones told witness and others how the killing occurred, and showed them how he and defendant squatted in the weeds at the point last described by the witness, where defendant shot Smith. Jones then piloted witness and his companions over the trail, to where the body was found, explaining that he and defendant carried the body over that route, resting with it for a few moments at the point near the old shop where the second pool of blood was found. Everything found on the ground corresponded with Jones's statement to the witness and his party, and to his voluntary statement at the inquest over the body.

The inquest upon the body of Smith was held on the morning after his death, at which time the defendant had left and was not on the Harrison place. On the morning of and soon after the discovery of the body, the witness and Alex Jones and others went to the house of the defendant, which they found securely closed. Alex Jones entered the house through one of the windows, and brought out a pair of pantaloons and a pair of boots, both the boots and pantaloons being covered with

blood. The blood was fresh, and, in the opinion of the witness, got on the said articles not longer than the night before. The boots showed that an effort had been made to remove the blood by washing. The defendant was a married man, but his wife was in Colorado county at the time of the killing. Witness had heard that the defendant was unduly intimate with Alice Ward, a young woman on the place, to whom Smith was to have been married on December 2, the day after his assassination. A marriage license, issued on December 1, authorizing the marriage of Smith and Alice Ward was found on the body of Smith. A pillow slip containing a few clothes was found near the body. Smith came to the Harrison neighborhood as a cotton picker in the fall, and remained. The witness had heard it stated frequently that the young negroes on the place objected to the marriage of Smith and Alice Ward, because, as they said, they did not have enough girls for themselves. He had also heard of an organization or conspiracy among the young negro men, including the defendant, Sam Grant and Charley Whitsey, to run Smith out of the neighborhood. The witness had heard of ill feeling between the defendant on one side and Sam Grant and Dan Ward on the other.

Bob Jones was the next witness for the State. He testified that he lived on the Harrison place, in Wharton county, at the time that Smith was killed. On the day of the killing the witness and Smith went to the town of Wharton with a load of corn, in a wagon which, together with the team, belonged to Mr. Spooner. While in Wharton, Smith secured license to marry Alice Ward, and it was generally known among the negroes on the place that the marriage would be solemnized on the next day — December 2. The witness at that time was working with John Henry Bailey, the father of the defendant, who lived on the Harrison place, in a house a short distance from the defendant's house. Upon his return from Wharton on the fatal evening, the witness went with the defendant to get a buggy in which it was the purpose of defendant to start to Colorado county on the next day, after his wife. After getting the buggy the witness and defendant ate supper at defendant's house. Soon afterwards they went to the lot and turned the mules out, after which defendant insisted that witness should go with him to the "middle quarter." Soon after starting to the middle quarter, the defendant showed the witness a pistol which he said he had purchased from Burton Jones.

After going about three hundred yards on the road, defendant left the road and went to a point in the weeds five or six feet distant from the said road, and squatted down. He then made the witness squat down behind him. Within a few moments Smith appeared, walking along the main road towards the "middle quarter," where he lived; and when he reached the point in the road immediately opposite the place wherein the witness and defendant were concealed, the defendant rose to his feet and fired upon Smith with the pistol he had recently exhibited to the witness. Defendant fired three shots. After the last shot witness heard Smith exclaim: "O Lord! O Lord! I am shot!" Witness then rose to his feet and started to run to the house, but defendant covered him with the pistol, and ordered him to return and help move Smith from the road. Witness then proposed that Smith should be taken to the house, where he could be attended to, but defendant replied that he would take him into the weeds and not into the house. The defendant then seized Smith's legs, and compelled witness to take his head and arms, and carry him to the point in the weeds where the body was subsequently found, stopping once near the shop beyond the sugar house, where Smith was placed on the ground and a short rest taken. Smith was shot in the right groin, and bled to death. He died about the time witness and defendant left him in the weeds.

On the next morning the witness met Anthony Hindon and told him all about the murder, and showed him how and where it was done. Defendant, when he shot and killed Smith, had on the pantaloons and boots which were exhibited at the inquest on the next day, with blood on them. The witness went home with defendant on the fatal night, after the shooting, and remained there until morning. They met no women until they got to Sam Wilson's place, at the gate of which they met Eliza Wilson, Louisa Stuart and Charity Bailey. One of the women said: "George, go up there and see Smith; he is shot." Defendant replied: "Oh, I don't know anything about it." Previous to the killing the rumor was current that the defendant was keeping Alice Ward. No person was with witness and defendant at the time of the shooting, and Smith was alone. Witness did not render any other assistance on the next morning other than carrying some water to the body. After shooting Smith, the defendant told witness that he would kill him, witness, if he reported him.

The witness was under arrest as an accomplice with defendant at the time of the examining trial. He made a voluntary statement of the whole transaction before the examination, but had previously, and before he was arrested, related the facts to Hindon and others. The shooting occurred, according to the estimate of the witness, between nine and ten o'clock. The moon was young, and was shining very dimly. The witness and defendant went to defendant's immediately after depositing Smith's body in the weeds and passed by Sam Wilson's house. Witness slept with defendant that night. He said nothing about what had occurred on that night, because he was then among the defendant's relatives, and was afraid to do so. Sam Wilson was in bed when witness and defendant reached his house. Peggy Fagan and Roberta Griggs were then at Sam Wilson's house. Fagan left the house when witness and defendant did, remarking that he was going to get his horse and go home. After getting into defendant's house, defendant so barred his doors that witness could not get out. On the next morning defendant got in his buggy and left, taking Roberta Griggs with him. Soon after the discovery of Smith's body, on the morning after the murder, the witness told the facts of the transaction to Anthony Hindon and others, and took them over the ground. Liza Wilson, Louisa Stuart and Charity Bailey, when witness and defendant met them at Sam Wilson's gate, said that they heard the shooting and heard Smith halloo. Neither Sam Grant, Dan Ward nor Charity Whitsey were present when defendant fired upon and killed Smith. The witness remembered Mr. Spooner and Calvin Timmons as among the parties present when he related to Hindon the facts of the killing.

Eliza Wilson testified, for the State, that she was the sister of the defendant. She was at home, at Sam Wilson's house, when the fatal shots were fired. The shots were fired in the direction of the place where Smith's body was subsequently found. After the shooting stopped, witness heard some person exclaim "O Lordy! O Lordy!" and, accompanied by Charity Bailey and Louisa Stuart, she went at once to the "middle quarter" where John Henry Bailey, the father of herself and the defendant, lived. They met no person while en route to the middle quarter. On the way back witness heard a groan. At her gate she found defendant and Bob Jones. She told defendant and Jones that she heard somebody groaning, but

they did nothing more than turn off and go toward's defendant's horse (house?). The witness and her companions met Dan Ward, Alice Ward's uncle, at the middle quarter, when they got there. Dan said that he was hunting Smith—that he heard the shooting and was afraid that Smith had been hurt. Smith left the witness's house about an hour before the shooting, saying that he was going to the house of Morris Ward with whom Dan Ward lived.

A. S. Jones testified, for the State, that he went to the Harrison plantation on the morning after the murder, and, accompanied by other parties, went to the house occupied by the defendant. Finding the doors closed and locked, the witness entered through a window and secured the bloody pantaloons and boots referred to by previous witnesses. Bob Jones, whom the witness considered to be a "little weak minded and scary," was on the scene of the killing the morning after it occurred. The witness and his brother, who was the sheriff of Wharton county, and another gentleman went at once to Colorado county to apprehend and arrest the defendant. They found him in Donovan's cotton field, in the said county, sitting in a buggy, with his neice, Roberta Griggs, and talking to several negroes who were at work. Donovan's cotton field was about thirty miles distant from the place of the murder.

Burton Jones testified, for the State, that the defendant came to him a day or two before the murder of Smith, and told him that he wanted to get the pistol he had bargained for. He got the pistol. Smith, riding in a wagon with Bob Jones, passed the witness on December 1, and was killed that night. Witness had never recovered his pistol from defendant, nor had he been paid for it.

W. J. Croom testified, for the State, that he acted as prosecuting attorney upon the examining trial of the defendant for the murder of John Smith. On his said examining trial, after being duly cautioned, the defendant made a voluntary statement. That part of the said voluntary statement which was not drawn out by questions was, in substance, as follows: Defendant stated that at night, about a week before the killing, he and Charley Whitsey, Dan Ward and Sam Grant met together for the purpose of maturing a plan to run Smith off; that Whitsey said: "If we do it at all, let's do it before he is married;" that Dan Ward said: "I don't give a d—n when it is done so that it is done before he is married; we don't want any

fellow coming in here marrying our girls;" that, on the fatal night, Dan Ward joined him and Bob Jones on the main road and asked him: "will this thing snap?" That about that time another crowd consisting of Sam Grant and Charley Whitsey came up, and that two shots were fired by that crowd; that Dan Ward then returned to where he and Bob Jones were standing and said: "I am going to shoot Smith;" that he, defendant, replied: "no, you had better not shoot the fellow, but shoot at him to scare him;" that Charley Whitsey shot at him twice, and Dan Ward shot at him once; that he, defendant, then said to Ward: "there, now! you have shot the fellow;" that Bob Jones said; "no, he is only scared;" that he, defendant, replied: "yes he has, and now let's carry him to the shop and then to the quarters;" that Dan Ward replied: "no, we will carry him nowhere;" that Whitsey, Ward and Grant then went to Smith, and Ward said: "let's turn him over and see where I shot him."

Louisa Stuart testified, for the State, that she was at Tillman Bailey's house at the time of the shooting. She met Smith at Tillman's gate, and spent some time in conversation with him, and was the last person, so far as she knows, to converse with him. Smith left the witness at the said gate, saying that he was going to the "middle quarter" where John Henry Bailey lived. He went in the direction of the said "middle quarter." He then had a bundle in his hand. Fifteen minutes later the witness heard the shooting, and with Charity Bailey and Eliza Wilson, went towards the place where she supposed the shots were fired. She saw no person at or near that place, but called Smith three times, and, after an interval, called him three times more, receiving no answer. On the way back home the witness and her companions met the defendant and Bob Jones at the gate near Sam Wilson's house. Witness said to the defendant: "George, where are you going? Let's go and see if Smith is not shot. I heard him groaning." Defendant replied: "No, if I go up there they will say I did it." Then witness proposed to defendant to go with her to tell Mr. Spooner and Mr. Viola. Defendant replied: "Well, I will go if all you women will go with me." Witness replied that she had the tooth ache and could not go. About twenty minutes after the shooting, Dan Ward, riding from the direction in which the shooting occurred, and going towards the quarters, passed the witness and her party. This was an hour at least before they met defendant and Bob Jones at Wilson's gate. The shooting occurred

about nine o'clock. Nobody was at John Henry Bailey's house when the witness and his party got there. Eliza Bailey was with witness when she met defendant and Bob Jones after the shooting. No person was at Sam Wilson's house when witness went there a short time before the shooting, but Fagan and Smith came soon afterwards. From Sam Wilson's Smith went to Morris Ward's, and witness went to Tillman Bailey's. Witness saw a pair of bloody pants and a pair of bloody boots at the inquest on the morning after the killing.

Sam Grant testified, for the State, that he was on the Lawson place, two and a half miles from the Harrison place, at the time Smith was killed. He was "bruising around" among the girls. Witness did not learn that he was accused of complicity in the murder of Smith until after the arrest of defendant. The witness did not see defendant on the day or night of the tragedy. At that time he and defendant were not on good terms. Previous to the falling out between witness and defendant, the defendant often told him that Alice Ward was his girl. The bloody pants and boots exhibited at the inquest, on the morning after the murder, belonged to defendant. A number of persons attending this trial could testify to the witness's presence at the Lawson place at the time of the killing.

Dan Ward, the uncle of Alice Ward, the girl to whom Smith was to have been married had he lived another day, was the next witness for the State. He testified that he spent the early part of the night at old man Parmer's. He heard the shots when he reached Mr. Spooner's house on his way home. Mr. Viola called witness about the time the shooting occurred. Witness had just then passed through Spooner's gate. Witness then went on to the house of his sister, Liza Bailey. Liza told him that she thought Smith had been shot, and asked him to look for him. Witness then went to look for Smith, and met Eliza Wilson, Louisa Stuart and Charity Bailey. He looked two or three hours for Smith without finding him. Within fifteen minutes after the shooting the witness passed within fifteen steps of where Smith's body was subsequently found, but heard no noise. Charley Whitsey, Alex Wyatt and Dan Thompson helped witness hunt for Smith on the fatal night. Witness had nothing to do with the shooting of Smith, and had no objection to the marriage of Smith and his neice Alice. Defendant was mad with witness for beating Alice. Mr. Viola and Albert

Harrison, present at this trial, knew the whereabouts of the witness when the fatal shots were fired.

Charley Whitsey testified, for the State, that he was at D. Henderson's house with Alex Wyatt and Dan Thompson at the time that Smith was killed. They remained at D. Henderson's house until nine, and then went to the Harrison place on which the killing occurred. They met Dan Ward, who told them that Smith had been killed,—that he was on his way home from old man Parmer's when he heard shooting and hallooing. Witness, Wyatt and Thompson then went home, two miles distant, remained about an hour and then returned to old man John Henry Bailey's house, where cooking was going on for Smith's wedding, and they remained there all night.

Anthony Hindon testified, for the State, that he was present at the inquest upon the body of Smith, and examined the body, on which he found a marriage license. Bob Jones told witness about the killing, much as he had related the facts on this trial. During the inquest witness took Bob Jones away from the crowd and asked him: "Did you have a hand in this thing?" Jones replied: "No, but I will tell you all about it," and did so. Bob Jones was neither a weak minded nor a scary person. Examination of the ground verified every statement made by Jones to witness.

The State closed.

The defense introduced the voluntary statement of Bob Jones as taken down in writing at the inquest. It did not vary in any material particular from his testimony on this trial.

The motion for new trial raised the questions discussed in the opinion.

*R. M. Brown* and *G. G. Kelley*, for the appellant.

*W. L. Davidson*, Assistant Attorney General, for the State.

HURT, JUDGE. Appellant Bailey, on the fourth day of March, 1887, was tried for the murder of John Smith, the trial resulting in a conviction for murder of the first degree, with the death penalty attached. From this judgment he appeals here.

When called upon for an announcement, appellant applied for a continuance of the case for want of the testimony of Horace Ashton and Richard Floyd, which being overruled, exception was taken and the case proceeded to trial. Counsel for appellant rely upon this and the overruling of the motion for

new trial for a reversal of the judgment. We must therefore consider these supposed errors in connection with the facts proven on the trial, to determine whether the facts proposed to be established by Ashton and Floyd are material and probably true.

In the application, appellant states that he expects to prove by these witnesses that one Dan Ward admitted in their presence that he, Dan Ward, killed deceased Smith, and that he also stated that defendant Bailey had nothing to do with the killing.

It would require a peculiar state of facts for Ward's statement to become competent evidence for another accused of the crime. And if the accused desires to rely upon such confession his application must state all the facts necessary to clearly show their admissibility. When and where were these confessions made? At the time of the homicide? Was Ward present at the time of the homicide? These are important matters to be shown in order to the competency of the confession.

This matter, however, is put to rest when considered in connection with the facts proven on the trial. Ward's connection with this homicide is not shown by the slightest testimony. On the contrary, the evidence clearly shows him to have been at another place when the deceased was shot. These facts, linked with the fact that a witness swears positively that he saw Bailey shoot deceased, render Ward's confession clearly inadmissible. The court did not, therefore, err in overruling the motion for new trial based upon this ground.

From the record it appears that appellant made a voluntary statement before the examining court, after being fully cautioned as the law directs. It also appears that a part of the statement was "drawn out by the county attorney," and that the whole statement was excluded on motion of appellant. The State was permitted, however, over appellant's objection, to prove by oral testimony such statements as were not thus drawn out. The record does not disclose by what means the statement was "drawn out by the county attorney." If the statement was voluntarily made, though in answer to questions propounded by the county attorney, it was admissible, and to exclude it was error. At the instance of appellant, however, the written statement was excluded. This being so, he can not complain of proof of oral testimony of the statements made by him voluntarily, after being duly cautioned.

Again, there was no possible danger of injury to appellant, because there is no variance between the oral and written evi_dence of what appellant did in fact state before the examining court.

Six jurors had been sworn to try the cause, when the venire was exhausted. The court ordered these jurors to be taken to a room until talesmen could be summoned; five retired under the charge of an officer, leaving juror Frankelstein remaining in the court room and seated in the bar, and he remained thus seated some minutes, separate from the other jurors. The affidavit of R. M. Brown presents a similar state of facts with reference to jurors Frankelstein and Rivers. Now, it is not pretended that any person conversed with either of these jurors upon any subject while separated from their fellows. But, conceding that these jurors had in fact conversed with others, this fact will not of itself necessarily require a reversal of the judgment. (Nance v. The State, 21 Texas Ct. App., 457, and authorities cited.)

Counsel for appellant propound this proposition: "A conviction can not be had upon the testimony of an accomplice, unless corroborated by other evidence," etc. The position is a sound one under our code, and unless the accomplice is corroborated, or the evidence of the other witnesses not accomplices is sufficient, the judgment must be reversed. Looking to the facts of this case, there can be no doubt of ample and cogent corroboration. If the testimony of the accomplice were stricken from the case, the other testimony sustained a very strong case against the appellant—such a case as would not, we think, be reversed for want of sufficient evidence.

There is a theory of the case presented by the voluntary statement of appellant which exhibits an offense of less degree than that for which he has been convicted. Under this state of case, counsel for appellant insists that the court below should have instructed the jury upon this phase, and, failing to do so, it is insisted that the judgment must be reversed. There being no exceptions to the charge, and no instructions requested by appellant, we must pass upon the supposed error in the light of the whole record, in determining whether appellant has been injured. When considered in connection with the whole evi_dence, there is not the most remote probability of the truth of the statement made by appellant before the examining court. And while it was the duty of the court to submit this theory by

proper instructions to the jury, still, as there was no objection to the charge and no special instructions asked, we can not for this error reverse the judgment, there being not the slightest probability of injury to appellant arising out of the omission.

It is urged that the testimony is not sufficient to support a conviction for murder of the first degree. We think differently. This record presents a homicide planned and executed deliberately—in cold blood. In fact, appellant waylaid and with great deliberation assassinated his victim, in pursuance of a purpose coolly and deliberately formed.

We find no error in the record, and the judgment is accordingly affirmed.

*Affirmed.*

Opinion delivered October 12, 1887.